UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK DONOHUE, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF S.J.D., Plaintiffs, -v- KAMAR H. SAMUELS ET AL., Defendants. | 26-CV-5329 (JMF) (and all consolidated cases) OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge:

Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "to assure that all children with disabilities have available to them a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (cleaned up). Congress "included within the IDEA procedural safeguards that enable parents and students to challenge" the decisions of a school district, first in state administrative proceedings and then in court. *Id.* During the pendency of these proceedings, the IDEA mandates that "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The Second Circuit has characterized this "stay-put" provision as, "in effect, an automatic preliminary injunction." *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982). The court of appeals has also held that, notwithstanding the IDEA's usual exhaustion requirements, a parent can seek to enforce the statute's stay-put provision in court without first seeking relief through the administrative process. *See, e.g.*, *Murphy*, 297 F.3d at 199. And

perhaps most notably here, the court of appeals has held that if a student's "pendency" placement is at a private school, the stay-put provision mandates school district funding of that placement — funding that cannot be recouped if the school district ultimately prevails on the merits. *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 531 & n.49 (2d Cir. 2020).

These structural features of the IDEA's stay-put provision create powerful incentives for abuse, as these cases illustrate. The cases — fifty-four in total — were filed by the Liberty and Freedom Legal Group ("LFLG") on behalf of the parents of students with disabilities ("Plaintiffs") attending or seeking to attend a school called the International Institute for the Brain ("iBrain"). For close to a decade, LFLG and iBrain have flooded the courts in this Circuit with cases seeking "emergency" relief pursuant to the IDEA's stay-put provision. Their transparent strategy: to get as much taxpayer money as they can, as quickly as they can, secure in the knowledge that whatever they get they can keep, even if it is later determined that they were not entitled to anything at all under the IDEA. For the most part, the courts in the Circuit — including the Second Circuit itself — have rejected these efforts. Most notably, in *Mendez v. Banks*, 65 F.4th 56 (2d Cir. 2023) — a case brought by LFLG on behalf of iBrain parents — the court of appeals held that "the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement" or otherwise require a school district to "circumvent its ordinary payment procedures." *Id.* at 63. But the *Mendez* Court left the door to emergency relief open a crack, allowing that "[p]arents . . . may still be able to obtain such relief if they establish that a delay or failure to pay has jeopardized their child's educational placement." *Id.*

In these cases, LFLG and iBrain seek to drive a truck through this crack in the emergency relief door. Specifically, mindful of the language in *Mendez*, the founder of iBrain and LFLG revised the contracts for Plaintiffs' children to require that Plaintiffs either pay hundreds of thousands of dollars by July 1, 2026, *or* obtain a court order by that date directing the New York

City Department of Education (the "DOE") to pay those amounts within thirty-five days (i.e., by on or about August 5, 2026). LFLG then filed these cases against the DOE and its Chancellor and, in each case, moved for a temporary restraining order ("TRO") and preliminary injunction requiring the DOE to "maintain, implement and fund" the child's placement at iBrain and accompanying nursing and transportation services by "no later than 35 days from July 1, 2026 (August 5, 2026)." *E.g.*, ECF No. 6, at 1. Citing the language in the contracts that iBrain itself drafted and that Plaintiffs themselves agreed to, LFLG argues that Plaintiffs are entitled to injunctions mandating immediate payments from the DOE — without regard for the DOE's ordinary payment procedures and regardless of how much the costs for the services have increased from prior years — because, absent such immediate payments, the educational placements of Plaintiffs' children would be jeopardized.

The principal question for the Court in these cases is whether, in light of the new contract language, Plaintiffs are entitled to a court order requiring the DOE to provide immediate funding pursuant to the stay-put provision — funding that, again, the DOE would not be able to recoup even if it later prevailed on the merits. The Court's emphatic answer: They are not. More specifically, while the Court concludes that *some* Plaintiffs are entitled to *some* relief under the IDEA's stay-put provision, they are entitled only to payments from the DOE in the ordinary course and only at the levels from prior years. To hold otherwise would enable parents and private schools to collude at the expense of school districts and, ultimately, the taxpayers. Indeed, that is precisely what iBrain, LFLG, and Plaintiffs set out to do here. The Court will not lend its equitable powers to their efforts. Accordingly, and for the reasons that follow, the Court GRANTS in part and DENIES in part Plaintiffs' motions for preliminary injunctions. Further, recognizing that this is only the latest chapter in the longstanding efforts of iBrain and LFLG to exploit the unique structural features of the IDEA's stay-put provision, the Court takes the

unusual — though not unprecedented — step of directing the Clerk of Court to send a copy of this Opinion and Order to relevant policymakers for their consideration.

## BACKGROUND

The Court begins with a summary of the statutory scheme and some background on iBrain, LFLG, and the firm's historical litigation practices before the federal courts, which provides important context. The Court then turns to the present motions for injunctive relief.

### A. Statutory Background

"The IDEA offers federal funds to states that demonstrate, *inter alia*, that they have developed plans to assure 'all children with disabilities residing in the state' a 'free appropriate public education' ('FAPE')." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 159-60 (2d Cir. 2004) (quoting 20 U.S.C. § 1412(a)(1)(A)). *See generally N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 580-81 (S.D.N.Y. 2013). "The centerpiece of the IDEA's education delivery system is the individualized education program, or IEP." *Murphy*, 297 F.3d at 197 (internal quotation marks omitted). A parent who is dissatisfied with a child's IEP or the State's provision of a FAPE may file a "Due Process Complaint" or "DPC" seeking administrative and judicial review pursuant to IDEA-mandated procedures. *See Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005). In New York, that review is provided in the first instance by Impartial Hearing Officers ("IHOs"), whose decisions are appealed to State Review Officers ("SROs"), whose decisions are, in turn, subject to review by federal district courts, which have the authority to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii); *see Mackey*, 386 F.3d at 160.

Significantly, during the pendency of administrative and judicial proceedings, the IDEA requires the State to "maintain the educational status quo while the parties' dispute is being resolved." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (internal quotation

marks omitted). In particular, the IDEA's "stay-put" provision provides in relevant part that, "during the pendency of any [administrative and judicial] proceedings conducted pursuant to this section, unless the [school district] . . . and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518. But the term "educational placement" does not refer to a particular brick-and-mortar school; it "refers only to the general type of educational program in which the child is placed — i.e., the classes, individualized attention and additional services a child will receive." *de Paulino*, 959 F.3d at 526 (cleaned up). To determine a child's "then-current educational placement" for purposes of the stay-put provision, a court looks to "(1) the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time when the stay-put provision of the IDEA was invoked; or (3) the placement at the time of the previously implemented IEP." *E. Lyme Bd. of Educ.*, 790 F.3d at 452 (internal quotation marks omitted). Additionally, the IDEA's implementing regulations "provide that a child's current placement may be changed upon agreement between the parents and the state, and that a [state administrative officer's] decision that agrees with the parents that a change of placement is appropriate . . . must be treated as such an agreement." *Mackey*, 386 F.3d at 163 (cleaned up); *see also* 34 C.F.R. § 300.518(a), (d) (containing the relevant provisions).

Regardless of the source of a pendency placement, the statute "require[s] a school district to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." *de Paulino*, 959 F.3d at 531 (internal quotation marks omitted); *see also Juca v. Banks*, No. 25-2327, 2026 WL 2435596, at *3 (2d Cir. Aug. 20, 2026). Further, it does *not* permit a school district to recoup any such payments — even if the school district later prevails on the underlying claims. *See de Paulino*, 959 F.3d at 531 & n.49 (citing cases); *see id.* at 531 ("Congress's policy choice was that a child

is entitled to remain in his or her placement at public expense during the pendency of an IEP dispute, regardless of the merit of the child's IEP challenge or the outcome of the relevant proceedings."). In part for that reason, the Second Circuit has held that it is "generally up to the school district to determine how an agreed-upon program is to be provided during the pendency of the IEP dispute." *Id.* at 525; *see id.* at 533 ("[I]t is the [school district], not the [p]arents, that is authorized to decide how (and where) the [s]tudents' pendency services are to be provided."); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) ("It is up to the school district to decide how to provide [the] educational program [required by the IDEA's stay-put provision], at least as long as the decision is made in good faith."). "Parents who are dissatisfied with their child's education can unilaterally change their child's placement during the pendency of review proceedings," but "[t]hey do so . . . at their own financial risk." *de Paulino*, 959 F.3d at 526 (cleaned up); *see also Juca*, 2026 WL 2435596, at *3. That is, "[t]hey can obtain retroactive reimbursement from the school district *after* the IEP dispute is resolved" — but *only* if they prevail on the merits of that dispute. *de Paulino*, 959 F.3d at 526; *see also T.M.*, 752 F.3d at 172.

Parents may seek to enforce the stay-put provision in the state administrative proceedings by requesting a pendency order from an IHO. *See Mendez*, 65 F.4th at 59-60. Significantly, however, parents may also seek to enforce the stay-put provision in federal court — whether or not they have requested, let alone been denied, a pendency order from an IHO. That is because, while administrative exhaustion is generally required before an aggrieved person may bring an action in court for a violation of the IDEA, "an action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions" to the exhaustion requirement. *Murphy*, 297 F.3d at 199; *accord de Paulino*, 959 F.3d at 530-31, 531 n.46; *Juca*, 2026 WL 2435596, at *3. As the Second Circuit has explained, "'given the time-sensitive nature of the

IDEA's stay-put provision,' and the amount of time it would take a plaintiff to exhaust the administrative process, 'an immediate appeal is necessary to give realistic protection to the claimed right.'" *de Paulino*, 959 F.3d at 531 n.46 (quoting *Murphy*, 297 F.3d at 199).

**B. iBrain and LFLG**

iBrain is a private, for-profit school for children with traumatic brain injuries and other brain-based disorders that was founded in or about 2018 by Patrick Donohue. *See id.* at 528-29. Donohue is an attorney and — in his capacity as the parent of S.J.D., a twenty-one-year-old woman with disabilities who attends iBrain — Plaintiff in the first-filed of these consolidated cases. *See* ECF No. 39 ("DOE Mem."), at 3.[1] Notably, however, these are not the only two hats that Donohue wears in these cases. He is *also* the founder and senior attorney of LFLG (formerly known as the Brain Rights Injury Group), the law firm that represents each of the Plaintiffs in these cases and has represented dozens of iBrain parents and students in similar actions over the last eight years. *See de Paulino*, 959 F.3d at 529; *see also Fiallos v. Aviles-Ramos*, No. 25-CV-7281 (JMF), 2025 WL 2961624, at *5 (S.D.N.Y. Oct. 20, 2025) (citing cases); DOE Mem. 3. As this Court has previously noted,

> iBrain and LFLG work hand-in-glove to facilitate these parents' unilateral enrollment of their disabled children at iBrain and to secure public funding for their education. More specifically, iBrain requires the parents of disabled children, upon enrollment, to sign contracts ostensibly promising to pay vast sums of money per year to iBrain and related providers for tuition and related services, including transportation and nursing services.

[1] The IDEA applies to "all children with disabilities . . . between the ages of 3 and 21, *inclusive*," 20 U.S.C. § 1412(a)(1)(A) (emphasis added), which means that a "a child remains eligible" for benefits under the IDEA "until [her] 22nd birthday." *A.R. v. Conn. State Bd. of Educ.*, 5 F.4th 155, 158 (2d Cir. 2021) (internal quotation marks omitted). Thus, although S.J.D. is no longer a minor, she is still eligible for benefits under the IDEA.

*Fiallos v. Samuels*, No. 25-CV-7281 (JMF), 2026 WL 2076004, at *2 (S.D.N.Y. July 17, 2026). LFLG then seeks to obtain funding for the contractual amounts from the DOE.

Donohue, for example, signed contracts promising to pay nearly *one million dollars* for the 2026-27 school year in two installments: (1) $404,943.58 in tuition and supplemental fees to iBrain, ECF No. 27-12 ("Donohue Contracts"), at 2; (2) $149,796.00 to a company called Sisters Travel and Transportation Services, LLC ("Sisters Travel") for transportation services, *id.* at 12; and (3) $352,430.00 to B&H Health Care Services ("B&H Health Care") for nursing services, *id.* at 22.[2] Notably, the fact that iBrain uses Sisters Travel and B&H Health Care to provide transportation and nursing services to its students does not appear to be a coincidence. Sisters Travel was founded by Donohue's wife, Gina Lynch-Khera. *See Founder's Story,* iBrain, https://perma.cc/3N6U-AGAQ (last visited August 8, 2026). And despite being drafted for different services from ostensibly independent companies, the contracts for Sisters Travel and B&H Health Care share the same nineteen section headings and contain substantially identical language. *See generally* Donohue Contracts. In a deposition, Donohue acknowledged that he was responsible for drafting the contracts on behalf of iBrain and that he then forwarded them to Sisters Travel and B&H Health Care, which subsequently incorporated edits he had made. *See* ECF No. 48-3 ("Donohue July 15, 2026 Tr."), at 77-79. Each Plaintiff in these cases signed nearly identical contracts; taken together, they amount to obligations totaling tens of millions of dollars to iBrain, Sisters Travel, and B&H Health Care for a single school year.

Given the sums at stake, one might think that the parents of iBrain students are taking on an enormous financial commitment (or, at a minimum, enormous financial risk), but the record

[2] References to page numbers in ECF Nos. 8-1, 27-12, 52-1, and 45-1 are to the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

shows that no Plaintiff — even those whose children have attended iBrain for several years — has *ever* made a tuition payment to iBrain or any payment to Sisters Travel or B&H Health Care. *See* ECF No. 52-1 ("Interrogatory Responses"), at 6-8. Some have occasionally paid a $100 deposit to iBrain; some have not even paid that token amount. *Id.*[3] That is because, in prior years, the relevant contracts "suspended all costs to parents while the child's lawsuit was pending before the state administrative agency" and "provided that, if the state denied funding and all appeals were exhausted, the parent would be permitted to immediately withdraw [their] Student from iBrain." *Fiallos*, 2026 WL 2076004, at *3 (internal quotation marks omitted). In short, iBrain's and LFLG's strategy is to secure all funding from the DOE.

**C. LFLG's Litigation Tactics**

Armed with these contracts, LFLG generally takes a series of steps on behalf of iBrain parents with the goal of securing funding as quickly as possible. First, it sends the DOE a "10-Day Notice," which is a document memorializing the parents' official rejection of the DOE's proposed IEP and notifying the DOE that the parents intend to unilaterally place their child at iBrain and seek funding pursuant to the stay-put provision of the IDEA. *See, e.g.*, ECF No. 8-1 ("Donohue Admin. Filings"), at 52. Less than ten days later (notwithstanding the name of the notice), LFLG files a DPC on behalf of the parents asserting pendency rights at iBrain and requesting that the IHO issue an "immediate interim order," known as a "pendency order," which "direct[s] DOE to fund and implement [the student's] pendency during this proceeding." *See, e.g.*, Donohue Admin. Filings 3. In most cases, the IHO invites the DOE to respond and then

---

3 Earlier versions of the iBrain contract refer to the $100 deposit as non-refundable, but as of July 2026, iBrain's website provided that "[t]he only out-of-pocket expense to attend iBRAIN is a *refundable* $100 deposit (all other costs suspended while securing funding from the Department of Education)." *See Founder's Story,* iBrain, https://perma.cc/3N6U-AGAQ (last visited August 8, 2026) (emphasis added).

issues a pendency order based on the parties' submissions, which the DOE then implements as a matter of course. *See, e.g.*, ECF No. 45-1.

But not content to wait for that process to play out, LFLG frequently runs to federal court — as it did in this case — and files "emergency" motions seeking a declaration of the child's pendency and expedited payment before the DOE has had a chance to weigh in and before the IHO has had the opportunity to issue a pendency order. *See, e.g.*, *Ramos v. Samuels*, Nos. 25-1321, 25-1355, 2026 WL 1346852, at *2 n.4 (2d Cir. May 14, 2026) (summary order) (observing the same pattern in an earlier case). For context, these efforts constitute a hugely disproportionate share of IDEA litigation in the federal courts. As this Court recently reported,

> Annually, the DPCs that LFLG files on behalf of the approximately fifty to sixty students at iBrain amount to less than 0.5% of all DPCs filed in New York City. And yet, approximately *50%* of the federal complaints raising claims under the IDEA against the DOE are filed by LFLG. LFLG's use — and abuse — of the federal courts' emergency procedures is arguably even more striking. Between 2019 and November 14, 2025, LFLG filed over 130 motions for injunctive relief in this District and the Eastern District of New York; in many of these cases, as here, LFLG filed multiple, successive emergency motions. In fact, between June 2023 and November 2025, LFLG's cases accounted for over *80% of all* "emergency" motions filed against the DOE.

*Fiallos*, 2026 WL 2076004, at *4 (footnotes and citations omitted). LFLG's "strategy is almost certainly driven by the fact . . . that payments made pursuant to the IDEA's stay-put provision cannot be recouped — even where it is later determined that the school district is not obligated to pay anything under the IDEA." *Id.* "That is, if LFLG succeeds in getting the DOE to pay up front, iBrain, Sisters Travel, and B&H Health Care (not to mention, LFLG itself) win — *even if they end up later losing*." *Id.*[4]

[4] The inability of the DOE to recoup funds that it would not otherwise have had to dispense under the IDEA is obviously central to the strategy of LFLG and iBrain because, if the issue were solely one of timing, iBrain could surely obtain financing to bridge the gap between an order mandating pendency funding and the dispensing of those funds in the ordinary course. The Court is not privy to what percentage of LFLG's clients ultimately lose on the merits, but it is not

The Second Circuit substantially closed the door on that strategy in *Mendez v. Banks*. In that case, LFLG had obtained pendency orders from IHOs declaring that several iBrain students were entitled to funding for tuition and related services during the pendency of the administrative proceedings. *See* 65 F.4th at 60. Rather than wait for the DOE to provide that funding in the ordinary course, however, LFLG moved in federal court for preliminary injunctions requiring the DOE to "immediately . . . fund[] the Students' tuitions and related services" pursuant to the pendency orders. *Id.* The Second Circuit rejected LFLG's attempt to jump the queue in that manner, holding that "the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement" or otherwise require the DOE to "circumvent its ordinary payment procedures." *Id.* at 63. The Court held open the possibility that "[p]arents . . . may still be able to obtain such relief if they establish that a delay or failure to pay has jeopardized their child's educational placement," *id.*, but it concluded that was not the case for the *Mendez* plaintiffs because "both sides agreed that there was no risk of the students losing their pendency placements." *Id.* (cleaned up). That conclusion "comport[ed] with the practical realities of bureaucratic administration": "If each pendency order entitled parents . . . to immediate payment, school districts would be unable to implement basic budgetary oversight measures, such as requiring receipts before reimbursement." *Id.*

Seemingly undeterred by *Mendez*, LFLG continued to flood the docket of this District with motions for emergency injunctive relief. In most cases, it tried to recast its request for relief as merely seeking "pendency funding in the ordinary course of business without undue delay" as

---

zero. *See, e.g.*, *Fiallos v. Samuels*, No. 25-CV-7281 (JMF), 2026 WL 2076004, at *5 (S.D.N.Y. July 17, 2026) (reporting that, one month after an IHO had granted the plaintiff a pendency order, the IHO ruled against the plaintiff on the merits and rejected her claim for $937,301.25 in taxpayer funds).

opposed to immediate payment. *Ramos*, 2026 WL 1346852, at *1. But in a summary order issued on May 14, 2026, the Second Circuit affirmed a district court's denial of that modified request, noting that the arguments LFLG raised were "substantially the same" as those that were made and rejected in *Mendez*. *See id.* at *3 ("To repeat our holding in *Mendez*, 'the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement,' and 'DOE must first withhold payments that have actually accrued before [p]laintiffs can seek those payments in court.'" (quoting *Mendez*, 65 F.4th at 61, 63)). In other cases, LFLG asserted that iBrain was in severe financial distress and on the verge of shutting down if it did not receive pendency payments. *See, e.g.*, *Fiallos*, 2026 WL 2076004, at *13. But when ordered to substantiate those claims through discovery, LFLG withdrew many of its motions and voluntarily dismissed most cases in which it made that assertion. *Id.* at *7. All in all, LFLG's attempts to secure expedited pendency funding in the immediate aftermath of *Mendez* were largely unsuccessful. *See Fiallos*, No. 25-CV-7281 (JMF), ECF No. 78, at 30 ("[LFLG] has not fully succeeded in many pendency cases after *Mendez*, true.").[5]

**D. Factual and Procedural Background**

That background provides important context for these cases, which constitute the latest attempt by LFLG to secure expedited pendency payments. In the interests of concision, the Court focuses the following recitation of facts on the details of Donohue's case, but the other fifty-three cases follow a broadly similar pattern unless otherwise indicated.

---

[5] In *Fiallos*, this Court concluded that these litigation tactics went too far and imposed sanctions on LFLG. Specifically, the Court held that sanctions were warranted because "LFLG [had] filed frivolous motions for the improper purpose of harassing the DOE into accelerating payments and that," post-*Mendez*, "it had no evidentiary basis to characterize its motions as 'emergencies.'" *Fiallos*, 2026 WL 2076004, at *1.

Donohue, as previously noted, is the parent and natural guardian of S.J.D., a twenty-one-year-old woman with disabilities who has been enrolled in iBrain for years. *See* DOE Mem. 3. On March 6, 2026, the DOE held a meeting with Donohue to discuss S.J.D.'s IEP for the upcoming 2026-27 school year and sent a finalized IEP to him three weeks later. *See* ECF No. 53-1, at 3-4. On April 22, 2026, the DOE sent Donohue another notice indicating that his child's IEP team had recommended placement for S.J.D. in a specialized public school. *See id.* at 2-3. In a letter dated June 10, 2026 — which was apparently received by Donohue on June 22, 2026 — the DOE reiterated its recommended placement for S.J.D. but stated that if Donohue chose to place her in iBrain for the 2026-27 school year, the DOE was "prepared to provide [her] daily transportation to and from iBrain" through the Office of Pupil Transportation ("OPT") "at *no* cost" to him. ECF No. 53-2 ("Donohue OPT Letter"), at 4. Meanwhile, on June 17, June 18, and July 6, 2026, Donohue signed contracts for the 2026-27 school year with Sisters Travel, iBrain, and B&H Health Care, respectively. *See generally* Donohue Contracts.

These contracts differed from the iBrain, Sisters Travel, and B&H Health Care contracts of prior years in at least one noteworthy respect: by requiring either 50% up-front payment from the parents or a court order directing the DOE to provide immediate funding. The iBrain contract, for example, provides as follows:

> For Student to attend iBRAIN and receive educational programming and related services for the 2026-2027 School Year, on or before July 1, 2026, either: (i) Parent(s)/Guardian(s) shall pay [50% of tuition]; or (ii) Parent(s)/Guardian(s) shall obtain a state or federal order on or before July 1, 2026, directing the local school district to fund Student's pendency placement at iBRAIN, consistent with the payment obligations set forth in this Enrollment Contract, including Student's Full Tuition and additional financial obligations due under this Enrollment Contract, no later than thirty-five (35) days after July 1, 2026.

Donohue Contracts 3. In a deposition, Donohue forthrightly acknowledged that he drafted this language to ensure that iBrain could get the relief that the Second Circuit had rejected in *Mendez*

— that is, an order forcing the DOE to "lock in" the pendency rights of the student, Donohue July 15, 2026 Tr. 64, and creating a "more definitive timeframe of implementation," Donohue July 17, 2026 Tr. 29. Through the contract, that is, Donohue sought to ensure that Plaintiffs could "establish that a delay" in DOE payment would "jeopardize[] their child's educational placement" — the condition that, according to the *Mendez* court, might entitle parents to immediate or expedited payment pursuant to the IDEA's stay-put provision. 65 F.4th at 63.

On June 18, 2026 — the same day Donohue signed the contract with iBrain — LFLG provided a 10-Day Notice to the DOE indicating that Donohue had formally rejected its proposed IEP and planned to "maintain [S.J.D.'s] . . . placement and program at iBRAIN during the pendency of any administrative and/or judicial proceedings" and "seek district funding . . . necessary for [S.J.D.] to access and benefit from the unilateral placement." Donohue Admin. Filings 52-53. The 10-Day Notice also preemptively rejected any "DOE/OPT transportation" as "part of [its] rejection of the DOE's proposed program and placement" and indicated Donohue's intent to seek funding for those services as well. *Id.* at 53. Four days later, on June 22, 2026, LFLG filed a DPC that "invoke[d] S.J.D.'s pendency and stay-put rights pursuant to 20 U.S.C. § 1415(j)" and requested, among other things, "an immediate pendency hearing so an Interim Order on Pendency can be issued by the IHO." *Id.* at 2. It asserted that the basis for S.J.D.'s pendency placement at iBrain and entitlement to nursing and transportation services was a prior unappealed final decision by an IHO. *Id.* Accordingly, it requested "[f]unding for the cost of tuition and supplemental services . . . paid directly to iBrain pursuant to the Enrollment Agreement"; "[f]unding for transportation services . . . to be paid directly to [Sisters Travel] . . .

pursuant to the Transportation Contract"; and "[f]unding for nursing services to be paid directly to [B&H Health Care] . . . pursuant to the Nursing Contract." *Id.* at 2-3.[6]

Just two days later — before the IHO had acted on either the DPC or Donohue's request for a pendency order — LFLG filed a complaint in federal court alleging that the DOE had, among other things, violated Section 1415(j) by "failing to maintain, implement, and fund S.J.D.'s pendency placement after [Donohue] filed the 2026-2027 DPC." ECF No. 1 ("Compl."), ¶ 250. And just two days after that, on June 26, 2026, LFLG filed its "emergency" motion for a TRO and preliminary injunction, asking the Court to issue an order "directing [the DOE] to maintain, implement and fund [S.J.D.'s] pendency placement no later than 35 days from July 1, 2026 (August 5, 2026), as required under 20 U.S.C. § 1415(j)." ECF No. 6, at 1. In support of these motions, LFLG argued that Section 1415(j) entitled Donohue to an "automatic" declaration that iBrain was his child's pendency placement and that the DOE was required to fund that payment. It further contended that Donohue was entitled to injunctive relief directing the DOE to make payments by August 5, 2026 because, under the terms of the contracts he had entered, S.J.D. could not attend iBrain or receive transportation and nursing services unless he either made the required payments himself by July 1, 2026, or received an order from a state or federal court by that date directing the DOE to make the required payments by August 5, 2026 — meaning "a delay" in DOE funding beyond August 5, 2026, would "jeopardize[]" S.J.D.'s

---

6 Although the DPC references a nursing contract attached as an exhibit, *see* ECF No. 8-1 ("Donohue Admin. Filings"), at 3, 47, 48, and a proposed pendency order attached to the DPC refers specifically to B&H Health Care as the provider of nursing services, *id.* at 78, no such contract is attached to the DPC as filed here. That may be because, for reasons that are not clear in the record, Donohue does not appear to have signed his contract with B&H Health Care until July 6, 2026 (five days *after*, it bears noting, the deadline for payment or a court order requiring DOE funding). *See* ECF No. 27-12 ("Donohue Contracts"), at 20-29.

"educational placement." *Mendez*, 65 F.4th at 63. In the alternative, LFLG argued that Donohue satisfied the traditional four-factor test for emergency injunctive relief. *See* ECF No. 7, at 14-20.

Shortly thereafter, the Court learned that Donohue's case was the first of many cases — fifty-four, to be precise — filed by LFLG on behalf of iBrain parents seeking the same "emergency" relief. Eventually, all fifty-four cases were reassigned to the undersigned and, on consent of the parties, consolidated (at least for purposes of ruling on the "emergency" motions). At a conference on June 30, 2026, the Court expressed "serious concerns about whether the contract[s]" with iBrain, Sisters Travel, and B&H Health Care were "collusive effort[s] to . . . generate irreparable harm that the school and parents [could not] show under *Mendez*." ECF No. 34 ("TRO Hearing Tr."), at 9. Nevertheless, the Court granted Plaintiffs' requests for TROs because it found that, on its face, the language of the contracts "satisfied" the requirements of *Mendez* and that further fact-finding was necessary to make a determination as to whether each Plaintiff would in fact suffer irreparable harm absent a preliminary injunction. *Id.* at 47. The Court indicated that it would aim to decide the preliminary injunction motions before August 5, 2026 — the TRO's deadline for the DOE's payments — and that, if it were to deny the motions for preliminary injunctions, it would also vacate the TRO and the DOE would not be required to make any unmade payments by the deadline. *See id.* At the hearing, it also became clear that not all Plaintiffs had prior unappealed final administrative decisions fixing pendency at iBrain, as Donohue did. *See id.* at 47-50. The Court directed the parties to develop processes for (1) "resolv[ing] any disputes over whether iBrain is the appropriate placement" for the fifty-four students; and (2) scheduling discovery and briefing for the preliminary injunction motions ahead of a hearing to be held on July 30, 2026. ECF No. 18, at 2.[7]

---

[7] After the issuance of the TRO, LFLG continued to file new cases for several days. The TRO covered the students involved in those cases as well. *See* ECF No. 18 ("On consent of the

Over the course of the next few weeks, the parties engaged in limited discovery. The DOE took depositions of Donohue and four other Plaintiffs regarding the relevant contracts and served a series of interrogatories requesting information about each child's placement at iBrain, the amount each parent had paid to iBrain and service providers historically, and the extent of their communications with iBrain, Sisters Travel, and B&H Health Care staff. *See, e.g.*, Interrogatory Responses 3-17. At the same time, the parties briefed: (1) the basis of pendency for those children who lacked an unappealed final administrative decision establishing their pendency at iBrain, *see* ECF Nos. 31 ("Pls.' Operative & Legal Source Mem."), 43 ("DOE Operative & Legal Source Opp'n"), 46 ("Pls.' Operative & Legal Source Reply"); and (2) whether a preliminary injunction was warranted as to all Plaintiffs, *see* ECF Nos. 26 ("Pls.' Suppl. PI Mem."), DOE Mem., 44 ("Pls.' Reply"), and 47.[8]

As of July 29, 2026, the parties agreed that the fifty-four Plaintiffs in these cases fall into three categories:

- Fourteen Plaintiffs (the "Operative Placement Plaintiffs") have no legal document establishing pendency at iBrain. Instead, they argue that iBrain is their "operative placement" because it was the school they were attending at the time they filed their DPCs.

- Three Plaintiffs (the "Legal Source Plaintiffs") rely on a legal document other than an unappealed final administrative order as the basis of their pendency placement at iBrain.

- Thirty-seven Plaintiffs (the "Undisputed iBrain Plaintiffs") have unappealed final orders from a state administrative officer that the parties generally agree establish iBrain as the relevant pendency placement.

parties, this Order applies to all cases involving students enrolled at [iBrain] in this District that were assigned or reassigned to the undersigned since June 24, 2026.").

8 The DOE also filed a motion to dismiss the Complaint. *See* ECF No. 38. In this Opinion and Order, the Court addresses one aspect of that motion — namely, the DOE's argument that Plaintiffs lack Article III standing. Otherwise, the Court reserves judgment on the motion.

*See* ECF No. 51 (spreadsheet submitted by the parties articulating these categories).[9] Donohue is among the Undisputed iBrain Plaintiffs. *See id.*

On July 30, 2026, the Court held oral argument on the preliminary injunction motions. At oral argument, LFLG voluntarily withdrew the preliminary injunction motions for two of the three Legal Source plaintiffs — namely, Plaintiffs in *Talley et al. v. Samuels et al.*, No. 26-CV-5334 (JMF), and *Cornett et al. v. Samuels et al.*, No. 26-CV-5609 (JMF) — without prejudice after conceding that the legal documents it purported to rely on to establish their pendency were not in the record. *See* July 30, 2026 Tr. 6. As to the other Plaintiffs' motions, the Court took the parties' arguments under advisement and, on July 31, 2026, issued a "bottom-line" order granting in part and denying in part Plaintiffs' motions for preliminary injunctions; vacating the June 30, 2026 TRO; and stating that an Opinion providing more detailed reasons for its decision would be forthcoming. *See* ECF No. 54. Specifically, the Court ruled as follows:

- The motions of the fourteen Operative Placement Plaintiffs are DENIED in full on the ground that they fail to establish pendency at iBrain consistent with the Second Circuit's decision in *de Paulino*.

- The motion of Plaintiff in *Kabba v. Samuels et al.*, No. 26-CV-5342 (JMF), is likewise DENIED in full because the only proffered basis for the pendency placement at iBrain is an interim pendency order, which, by itself, does not and cannot establish pendency in future proceedings.

- The motions filed by the Undisputed iBrain Plaintiffs are GRANTED to the extent they seek an order declaring that iBrain is each relevant student's pendency placement while litigation at the administrative level unfolds and requiring the DOE to make payments for those students' tuition and related services to iBrain and for nursing services to B&H Health Care based on the amounts approved in the students' prior unappealed final order. But they are DENIED to the extent they seek an order requiring the DOE (1) to make such payments by August 5, 2026 (or any date certain); (2) pending further consideration at the administrative level, to pay any increases in the amounts charged by iBrain for tuition and related services and by B&H Health Care for nursing services relative to the last relevant school year; and (3) to make any payments for transportation services to

[9] As noted below, in a later submission, the DOE expressed its view that two of the Plaintiffs were miscategorized. *See* ECF No. 64.

> Sisters Travel. Instead, the DOE shall make payments for tuition and related services to iBrain and nursing services to B&H Health Care in accordance with its "its ordinary payment procedures." *Mendez*, 65 F.4th at 63.

*See id.* at 1-2.

Later on July 31, 2026, LFLG filed an email from iBrain's Chief Operating Officer notifying parents that the school could not "permit students to attend iBrain beginning Monday, August 3, 2026, unless and until the Court reverse[d], modifie[d], clarifie[d], or stay[ed] today's Order." ECF No. 55-1. Citing the email, LFLG moved for limited relief from the Court's Order, including: (1) a "temporary stay of the vacatur of the June 30, 2026 TRO" solely for the thirty-seven students with undisputed pendency at iBrain; and (2) "clarification or direction that the DOE shall, by noon on [August 3, 2026], or as soon as practicable, confirm and implement concrete, student-specific OPT transportation arrangement equivalent to the services listed in each student's prior unappealed final order." ECF No. 55. The Court declined to stay its vacatur of the TRO but did modify the July 31, 2026 Order to permit the DOE more time to implement transportation arrangements through OPT and allow the thirty-seven Undisputed iBrain Plaintiffs to use Sisters Travel in the interim — with the right to later reimbursement from the DOE in the ordinary course. *See* ECF No. 56. On August 3, 2026, LFLG filed a notice of appeal of the Court's July 31, 2026 Order to the Second Circuit.[10]

---

[10] Although a notice of appeal ordinarily divests a district court of jurisdiction "with respect to issues decided in the order being appealed," *Satcom Intern. Grp. PLC v. Orbcomm Intern. Partners, L.P.*, 55 F. Supp. 2d 231, 234 (S.D.N.Y. 1999) (internal quotation marks omitted), LFLG's notice of appeal does not divest this Court of its authority to issue this Opinion and Order explaining its prior ruling. *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 1231 n.1 (W.D. Tex. 2023) (Guaderrama, J., dissenting) (observing that, where a district court has issued a bottom-line order from which an appeal has been taken, the court may explain the reasoning behind the order but may not "substantively modify" it); *see also, e.g.*, *In re Chevron Corp.*, 749 F. Supp. 2d 170, 174-75, 178-79 (S.D.N.Y. 2010) (suggesting that if a district court "rule[s] on [a discovery motion] by summary order, indicating that a full opinion [will] follow," but the losing party then appeals that summary order before the district court releases its full opinion, then the pending interlocutory appeal does not divest the district court of

On August 10, 2026, the parties filed a joint letter, ECF No. 63, in which the DOE sought modification of the Court's July 31, 2026 Order insofar as it pertained to two Plaintiffs and LFLG requested that the Court "(1) permit the parties to submit a further joint letter by August 17, 2026, or within one week of the Court's forthcoming Opinion, proposing a coordinated briefing schedule for the remaining claims, . . .; and (2) direct DOE to file, by August 21, 2026, a status report addressing its compliance with the Court's existing Orders as set forth above." *Id.* at 5. The Court denied DOE's requested modification on the grounds that it was procedurally improper and that, in light of Plaintiffs' filing of the notice of appeal, the Court lacked jurisdiction to order it. *See* ECF No. 64.[11] And it noted that it would address all other issues raised in the parties' joint letter in its forthcoming opinion. *See id.*

**LEGAL STANDARDS**

The traditional standard governing the issuance of a preliminary injunction is well established. A party seeking such relief bears the burden of showing (1) "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiffs'] favor"; (2) that it is "likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in [its] favor"; and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (cleaned up). Moreover, the Supreme Court has repeatedly reaffirmed that "[a] preliminary

---

jurisdiction to issue the full opinion so long as it merely "expand[s] on the reasoning underlying the" order without "alter[ing] the order in any respect"), *aff'd sub nom. Lago Agrio Pls. v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010) (summary order).

[11] That said, the Court invited the DOE to file a motion for reconsideration or modification seeking an indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure. *See* ECF No. 64. On August 17, 2026, the DOE filed such a motion. *See* ECF No. 65.

injunction is an extraordinary remedy never awarded as of right" and, thus, that, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). Applying that standard, the Supreme Court has denied injunctive relief based solely on the third and fourth equitable factors. *See id.* at 23-24.

In their briefing, Plaintiffs contend that the traditional preliminary injunction standard does not apply to their motions because the stay-put provision operates as an "automatic" injunction that establishes their children's placement at iBrain, entitlement to associated services, and entitlement to DOE funding. *See* Pls.' Suppl. PI Mem. 4. That argument finds support in Second Circuit precedent characterizing Section 1415(j) as, "in effect, an automatic preliminary injunction," which "substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Ambach*, 694 F.2d at 906. These cases instruct district courts when faced with a case involving the stay-put provision to "focus[] on identifying 'the then current educational placement,' and, further, on who should pay for it." *Id.*

During oral argument, however, Plaintiffs conceded that that the Court retains equitable discretion to grant or deny a preliminary injunction. *See* July 30, 2026 Tr. 39 ("I think the Court always has equitable authority . . . [to] say[] it would be equitable not to require the city to pay pendency.") ; *id.* at 43-44 ("I think [the Court] always maintains that authority [to not issue an order directing the DOE to make payments within 35 days]."). That concession was sound, for either or both of two reasons. First, the *Mendez* Court clarified that Section 1415(j) "entitles families to automatic relief with respect to educational placement *but not with respect to payments*." *Mendez*, 65 F.4th at 59 (emphasis added). The Court allowed that plaintiffs seeking

payments pursuant to the stay-put provision "may still be able to obtain such relief if they establish that a delay or failure to pay has jeopardized their child's educational placement." *Id.* at 63. But the Court equated a "jeopardized" educational placement to the "irreparable harm" factor of the traditional preliminary injunction standard. *See id.* at 64. And it proceeded to consider the plaintiffs' claims there under the traditional preliminary injunction factors. *See id.* at 63-64. *Mendez*, in other words, stands for the proposition that something more than mere invocation of Section 1415(j) is required to secure relief beyond maintenance of a child's then-current educational placement and funding in the ordinary course. Second, the IDEA provides that a district court entertaining an action under the statute shall "bas[e] its decision on the preponderance of the evidence, [and] *shall grant such relief as the court determines is appropriate*." 20 U.S.C. § 1415(i)(2)(C)(iii) (emphasis added). That broad mandate applies even when, as here, a plaintiff seeks to invoke Section 1415(j), the stay-put provision. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 328 (1988) (holding that "[t]he stay-put provision in no way purports to limit or pre-empt the authority conferred on courts" by Section 1415(i)(2)(C)(iii) to "grant such relief as the court determines is *appropriate*" (emphasis added)); *Mackey*, 386 F.3d at 165 (noting, in the context of a pendency dispute, that the phrase "such relief as the court determines is appropriate, within the meaning of 20 U.S.C. § 1415(i)(2)(B)(iii), means that equitable considerations are relevant in fashioning relief" (cleaned up)).

Thus, the Court concludes that a plaintiff seeking a preliminary injunction pursuant to Section 1415(j) is indeed entitled to an "automatic" injunction maintaining his or her child's then-current educational placement and ordering funding for that placement in the ordinary course. But to the extent that a plaintiff seeks more — including, as most relevant here, an order directing a school district to provide payments for a student's placement immediately or by a date-certain — the plaintiff must satisfy the traditional preliminary injunction factors. Notably,

that conclusion is consistent with the conclusions of at least two other district courts in this Circuit following *Mendez*. *See Otero v. Aviles-Ramos*, No. 25-CV-2773 (PAE), 2025 WL 2078950, at *2 (S.D.N.Y. July 24, 2025) ("To the extent, however, that a parent's requests go beyond maintenance of her child's then-current educational placement — for instance, in seeking immediate reimbursement of pendency tuition — the traditional preliminary injunction factors come back into play."); *Moonsammy v. Aviles-Ramos*, No. 25-CV-5923 (AT), 2025 WL 2452350, at *2 (S.D.N.Y. Aug. 26, 2025) (turning to "the traditional preliminary injunction factors" because "Plaintiffs . . . seek an order directing the DOE to fund the students' pendency placements"), *appeal filed*, No. 26-277 (2d Cir. Feb. 6, 2026). It is also consistent with the approach of the Ninth Circuit. *See N.D. ex rel. Parents Acting as Guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1112 (9th Cir. 2010) (holding that "[t]he district court did not err in considering all factors of the preliminary injunction test" when faced with a "claim underlying the preliminary injunction . . . that the stay-put provision applies").

Accordingly, in evaluating Plaintiffs' motions for preliminary injunctions, the Court's analysis will first address, as to each category of Plaintiffs, whether they are entitled to "automatic" injunctions declaring their pendency placement at iBrain and providing DOE funding for iBrain tuition and related services. To the extent that any Plaintiffs are entitled to that relief, the Court will then turn to the traditional preliminary injunction factors to evaluate the main question presented by Plaintiffs' motions: whether Plaintiffs are entitled to injunctive relief directing the DOE to fund their placements in the amounts and on the accelerated timetable set forth in the contracts that Donohue deliberately drafted for that purpose.

## DISCUSSION

As noted, the fifty-four Plaintiffs in these cases fall into three categories: (1) fourteen Operative Placement Plaintiffs who lack any legal document establishing the basis of their

pendency; (2) three Legal Source Plaintiffs who rely on a legal document other than a prior unappealed final administrative decision as the basis of their pendency placement at iBrain; and (3) thirty-seven Undisputed iBrain Plaintiffs who have prior unappealed final administrative decisions that the parties generally agree establish iBrain as their pendency placements. After briefly addressing the jurisdictional issue of standing — which applies to all Plaintiffs — the Court will evaluate the claims of each category of Plaintiffs in turn.[12]

**A. Standing**

As a threshold matter, the DOE challenges the Article III standing of Plaintiffs to bring claims in federal court and moves to dismiss their claims on that basis pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Specifically, the DOE argues that Plaintiffs cannot establish the injury-in-fact needed to support Article III standing because the contracts they signed are illusory or unconscionably collusive. *See* DOE Mem. 21-23. That argument, however, is squarely foreclosed by the Second Circuit's decision in *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442 (2d Cir. 2014). There, the Second Circuit held that a parent's "contractual obligation to pay private-school tuition" is sufficient to confer Article III standing on a plaintiff seeking reimbursement or direct funding to satisfy that obligation. *Id.* at 457. Moreover, the Court explicitly noted that any arguments regarding "whether the [parent's] arrangement with the school was fraudulent or collusive" do not "bear [] on" the "standing analysis under Article III, but on the equities of plaintiff's claim for relief." *Id.* at 461. Here, each Plaintiff entered

---

12 Although the Court did not explicitly address the issue of standing in its July 31, 2026 bottom-line Order, it obviously concluded that Plaintiffs had standing because, absent that conclusion, it could not have addressed the merits of Plaintiffs' motions. *See, e.g.*, *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) ("Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." (cleaned up)). Accordingly, and because standing is jurisdictional, the Court may — indeed, must — address it here notwithstanding Plaintiffs' filing of a notice of appeal.

identical contracts with iBrain, Sisters Travel, and B&H Health Care obligating them either to make payments by July 1, 2026, or secure a court order by July 1, 2026, that directs the DOE to make those payments by August 5, 2026. *See, e.g.*, Donohue Contracts 3, 12, 22. That is sufficient to establish their standing. Accordingly, to the extent the DOE's motion to dismiss is premised on Rule 12(b)(1), it must be and is DENIED.

**B. Operative Placement Plaintiffs**

It is undisputed that the fourteen Operative Placement Plaintiffs lack prior unappealed final administrative decisions establishing iBrain as their pendency placements. Instead, they argue that (1) their pendency is at iBrain because their children were enrolled at iBrain when they filed their DPCs; and (2) the DOE must therefore fund that placement by August 5, 2026 to maintain the "status quo" for these students. *See* Pls.' Operative & Legal Source Mem. 16-19. That argument is squarely foreclosed by Second Circuit precedent.

To determine a child's "then-current educational placement" for the purposes of the stay-put provision, a court looks to "(1) the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time when the stay-put provision of the IDEA was invoked; or (3) the placement at the time of the previously implemented IEP." *E. Lyme Bd. of Educ.*, 790 F.3d at 452. But as the Second Circuit noted in *de Paulino*, the "operative placement" basis for pendency is relevant only in "cases where the school district attempts to move the child to a new school without the parents' consent, or where there is no previously implemented IEP." *de Paulino*, 959 F.3d at 536. Accordingly, "[c]ourts typically rely on the 'operative placement' factor only when there is no previously-implemented IEP to guide the determination of a child's 'current educational placement.'" *Melendez v. N.Y.C. Dep't of Educ.*, 420 F. Supp. 3d 107, 122 (S.D.N.Y. 2019) (quoting *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15-CV-9679 (NSR), 2018 WL 4103494, at *6 (S.D.N.Y. Aug. 28, 2018)); *accord*

*de Paulino*, 959 F.3d at 536 (rejecting a similar "operative placement" theory). That is not the case here. Each Operative Placement Plaintiff's child has either a "prior uncontested IEP" placing them in a public school or, in the case of Plaintiff Wendy Leger, has a prior unappealed final administrative decision establishing pendency at a private school other than iBrain. *See* ECF No. 43, at 6. Accordingly, it is those documents — not the children's unilateral "placement" at iBrain — that establishes their pendency.

Plaintiffs offer two main rejoinders, but neither is persuasive. First, they argue that the DOE failed to "provide a pendency program or placement" before they filed their 10-Day Notices or before the beginning of the school year on July 1, 2026, and that their pendency placements can therefore lie only at iBrain. *See* Pls.' Operative & Legal Source Mem. 11-12. But that argument finds no support in the IDEA and, even if it did, Plaintiffs' assertions that their children's pendency lies exclusively in iBrain and their preemptive refusals to consider any alternative arrangements in their 10-Day Notices confirms as a factual matter that any alternative offers by the DOE would have been futile. On top of that, the DOE represents that it is "willing to provide what it deems to be an appropriate pendency placement to any parent seeking one at no cost to the parent." ECF No. 43, at 6-7. Perhaps realizing the weakness of that argument, Plaintiffs' fallback position is that the DOE's failure to place these children's prior uncontested IEPs and prior unappealed final administrative decisions in the record makes it impossible for the Court to determine each students' pendency. *See* Pls.' Operative & Legal Source Reply 4-5. But that ignores the fact that a party seeking a preliminary injunction bears the burden to produce evidence in support of it. Accordingly, to the extent the record is silent as to each child's "then-current educational placement," that silence weighs against Plaintiffs, not in their favor.

At bottom, the Operative Placement Plaintiffs are attempting to avail themselves of the stay-put provision to secure funding for their unilateral placements at iBrain but they have failed

to demonstrate that their "then-current educational placement" is actually at iBrain. Their requests are thus squarely foreclosed by *de Paulino*, in which the Second Circuit held that it is "generally up to the school district to determine how an agreed-upon program is to be provided during the pendency of the IEP dispute." *de Paulino*, 959 F.3d at 525. To hold otherwise would "render[] the stay-put provision meaningless by denying any interest of a school district in resolving how the student's agreed-upon educational program must be provided and funded." *Id.* at 536. Like the plaintiffs in *de Paulino*, the Operative Placement Plaintiffs are welcome to unilaterally place their children in iBrain and seek retroactive reimbursement through the administrative process, but because iBrain is not their pendency placement, they must "do so . . . at their own financial risk." *Id.* at 526 (cleaned up). Accordingly, their motions for a preliminary injunction must be and are DENIED in full.

**C. Legal Source Plaintiffs**

The preliminary injunction motions of the three Legal Source Plaintiffs, who purport to rely on documents other than prior final unappealed administrative decisions to establish their pendency at iBrain, fare no better. At oral argument, counsel for Plaintiffs voluntarily withdrew (without prejudice to renewal) the motions of two of these Plaintiffs — Shantel Talley and Donna Cornett — after conceding that there was no evidence in the record establishing their children's pendency at iBrain. *See* July 30, 2026 Tr. 5-6.

That leaves Plaintiff Bintu Kabba, who contends that her child's pendency at iBrain is established by an interim pendency order previously issued by an IHO. *See* DOE Mem. 8; *see also* ECF No. 51. But LFLG does not cite — and the Court has not found — any authority for the proposition that an IHO's pendency order can serve as the basis for future pendency. Indeed, the only applicable authority is to the contrary. In *Polanco v. Carranza*, No. 19-CV-8870 (MKV), 2024 WL 4354861 (S.D.N.Y. Sept. 27, 2024), Judge Vyskocil held that a "Plaintiff

simply cannot rely on [an interim pendency order] relating to an *earlier* academic year to establish [their child's] pendency," *id.* at *7, because of a long line of caselaw suggesting that, "to represent an agreement between the parties" and thus constitute a pendency-setting event, an "unappealed decision upon which pendency may be based must be a *final* decision *on the merits*," *id.* at *6. She further reasoned that "to find otherwise would undermine the clear import of *Ventura de Paulino*, which holds that when parents who are dissatisfied with their child's education unilaterally enroll their children in a private educational placement pending a due process complaint, they do so at their own financial risk." *Id.* at *7 (citing *de Paulino*, 959 F.3d at 526, 534).

The Court agrees with Judge Vyskocil's reasoning and adopts it here, adding only that it is further supported by the IDEA's implementing regulations, which establish that only a state administrative official's "agree[ment] with the child's parents that a change of placement is appropriate . . . must be treated as an agreement between the State and the parents" for the purposes of pendency. 34 C.F.R. § 300.518(d). Because an interim pendency order does not constitute such an "agreement," let alone purport to make any finding "that a change of placement is appropriate," it cannot serve as a pendency-setting event under the plain language of the implementing regulation. Accordingly, the Court finds that Plaintiff Kabba has failed to establish her child's pendency at iBrain. Like the Operative Placement Plaintiffs, she too is free to unilaterally enroll her child at iBrain and seek retroactive reimbursement, but she must "do so . . . at [her] own financial risk." *de Paulino*, 959 F.3d at 526 (cleaned up). The Legal Source Plaintiffs' motions for preliminary injunctions therefore must be and are DENIED in full as well — though in the case of Plaintiffs Talley and Cornett, that denial is without prejudice to renewal with adequate supporting documentation.

**D. Undisputed iBrain Plaintiffs**

That leaves the thirty-seven Undisputed iBrain Plaintiffs — i.e., those who have prior unappealed final administrative decisions that the parties generally agree establish their pendency at iBrain. As to these Plaintiffs, the DOE makes only one argument against iBrain as the relevant pendency placement: that "each student here seeks substantially more in total funding than in prior school years." DOE Mem. 9. But the only authority that the DOE cites in support of its argument — *C.S. v. N.Y.C. Dep't of Educ.*, No. 24-CV-2111 (ER), 2025 WL 3224989 (S.D.N.Y. Nov. 19, 2025) — is easily distinguished. First, the *C.S.* court largely rested its holding denying funding on the fact that the school in question had undergone a "change in corporate structure . . . constitut[ing] the type of unilateral modification . . . warrant[ing] denial of Plaintiffs' demand for reimbursement." *Id.* at *8. Second, the tuition increases in *C.S.* were nearly 100% — substantially larger than those here. *See* Pls.' Reply 19 (citing No. 25-499, OFFICE OF STATE REV., https://perma.cc/WX89-G549 (Apr. 28, 2026)).

Thus, the Court concludes that Section 1415(j) entitles the Undisputed iBrain Plaintiffs to an "automatic" injunction declaring that their pendency placements are at iBrain and that the DOE must fund tuition and related services at the school. Likewise, the DOE does not dispute — and the Court will therefore order — that it must pay for those students' nursing services through B&H Health Care as well. That is because each prior unappealed final administrative decision constitutes an "agree[ment] with the child's parents that a change of placement is appropriate," which "must be treated as an agreement between the State and the parents" that establishes pendency. 34 C.F.R. § 300.518(d); *see also de Paulino*, 959 F.3d at 532 (observing that a child's placement may "be changed if an impartial hearing officer or state review officer finds the parents' new placement to be appropriate by adjudicating the IEP dispute in the parents' favor, and the school district chooses not to appeal the decision"); *Board of Educ. of*

*Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 484 (2d Cir. 2002) ("[O]nce the parents' challenge succeeds . . . consent to the private placement is implied by law, and the requirements of § 1415(j) become the responsibility of the school district.").[13]

That relief honors Plaintiffs' entitlement under Section 1415(j) "to automatic relief with respect to educational placement," *Mendez*, 65 F.4th at 59, and the principal that "funding goes hand-in-hand with placement," *id.* at 62 (internal quotation marks omitted). It is also consistent with the relief ordered by other judges in this District entertaining similar claims before the issuance of any pendency order at the administrative level. *See, e.g.*, *Moonsammy v. Banks*, No. 24-CV-2616 (PAE), 2024 WL 2831042 (S.D.N.Y. June 3, 2024) (partially granting a request for a preliminary injunction by "declar[ing] iBrain to be [the child's] pendency placement and requir[ing] the Department to fund [the child's] placement at iBrain from the beginning of the 2023-24 school year until the [plaintiffs'] challenge to [the] most recent IEP is resolved"); *Crespo v. Aviles-Ramos*, No. 25-CV-7563 (JAV), 2025 WL 3022389, at *5 (S.D.N.Y. Oct. 29, 2025) ("The Court declares iBRAIN as [the children's] pendency placement and requires DOE to fund their placement at iBRAIN from the date they filed their DPC until the challenge to their most recent IEP is resolved."), *appeal docketed*, No. 26-127 (2d Cir. Jan. 21, 2026). Finally, it is supported by the DOE's concession at oral argument that the Undisputed iBrain Plaintiffs "are,

---

[13] There is some tension between the proposition that a prior unappealed final administrative decision can establish pendency placement for a child in a specific school and Second Circuit precedent defining an "educational placement" as only "the general type of educational program in which the student is placed," which "does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers while his administrative and judicial proceedings are pending." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) (cleaned up). But because the DOE generally concedes that Plaintiffs' children's last agreed-upon placements were iBrain and that nursing services should continue to be provided through B&H Health Care, the Court need not and does not resolve that tension here. *See, e.g.*, DOE Mem. 7 (conceding that some students have unappealed orders "establishing a program at iBrain as their last agreed upon placement").

at least theoretically, entitled to an order determining that they are entitled to the specific services and the specific program that they received last year." July 30, 2026 Tr. 47.

That said, the Court concludes that the Undisputed iBrain Plaintiffs are *not* entitled to an order (1) requiring the DOE to pay for transportation services with Sisters Travel pursuant to the stay-put provision; (2) mandating that the DOE make payments on an expedited basis, let alone by any date certain; or (3) requiring the DOE to pay more than the costs of tuition and nursing services for the 2025-26 school year. The Court will address each of these caveats in turn.

**1. Transportation Services**

As noted, in addition to tuition at iBrain and nursing services through B&H Health Care, each of the Undisputed iBrain Plaintiffs seeks a declaration that he or she is entitled to transportation services as established in the last unappealed final administrative order and that the DOE is obligated to fund those services by making payments to Sisters Travel. *See, e.g.*, Pls.' Reply 19-20. The DOE argues that it is not obligated provide that funding because it has offered to provide those services directly to these Plaintiffs. *See* DOE Mem. 10-11.

The Court concludes that the DOE has the better of the argument. The Second Circuit has held that the "pendency provision does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers while his administrative and judicial proceedings are pending. Instead, it guarantees only the same general level and type of services that the disabled child was receiving." *T.M.*, 752 F.3d at 171 (citation omitted). Accordingly, "[i]t is up to the school district to decide" in the first instance "how to provide that educational program, at least as long as the decision is made in good faith." *Id.* In *T.M.*, that meant that a school district that offered to provide required pendency services directly to a student was not required to continue direct funding of the students' preferred private providers for those services. *See id.* at 171-72. That was because when the plaintiffs there "rejected [the school district's]

offer to provide pendency services directly . . . they took responsibility for the cost of obtaining those services from private providers." *Id.* at 172. Those principles control here. The DOE made offers before the beginning of each school year to provide transportation services directly to each Undisputed iBrain Plaintiff's child at no cost to the parents. *See* Donohue OPT Letter 4. Each Plaintiff rejected that offer (perhaps even before seeing it), *see, e.g.*, Donohue Admin. Filings 53, and accordingly "took responsibility for the cost of obtaining those services from private providers." *T.M.*, 752 F.3d at 172.

Plaintiffs argue that the DOE's offer is not "genuine" — i.e., not made in good faith — because (1) it came after Plaintiffs had already signed their contracts with Sisters Travel and therefore could not be considered; (2) it would provide transportation services pursuant to the 2026-27 IEP, rather than the services set forth in the child's last unappealed final administrative order; and (3) it is conditioned on iBrain supplying the DOE with certain documentation, including a valid certificate of occupancy for the school building to operate as a school. *See* Pls.' Reply 20-21. But these concerns do not entitle Plaintiffs to full funding for Sisters Travel.

First, the chronology does not suggest any bad faith on the DOE's part; in fact, if anything, it suggests bad faith on *Plaintiffs'* parts. In Donohue's case, for example, the OPT Letter was dated June 10, 2026, Donohue OPT Letter 4, was mailed out on June 12, 2026, and was delivered on June 22, 2026, *see* Donohue OPT Letter 2, all before the beginning of the 2026-27 school year on July 1, 2026. During that twelve-day period, Donohue signed his contract with Sisters Travel (on June 17, 2026), *see* Donohue Contracts 19; emailed a 10-Day Notice that preemptively rejected any "DOE/OPT" transportation (on June 18, 2026), *see* Donohue Admin. Filings 53-55; and filed his DPC requesting pendency payments made directly to Sisters Travel (on June 22, 2026), *see id.* at 1, 3. That timing makes plain that Donohue (like the other Undisputed iBrain Plaintiffs) was aware that an offer of transportation was forthcoming from

OPT and that he had no intention of accepting such an offer — regardless of what it was or when it was delivered. To allow a parent to force a school district's hand in this manner — by denying the school district a reasonable amount of time to determine before the school year begins how to provide and fund the student's pendency placement — would undermine the proposition that "[i]t is up to the school district to decide" in the first instance "how to provide" a student's pendency services, *T.M.*, 752 F.3d at 171, and "render[] the stay-put provision meaningless by denying any interest of a school district in resolving how the student's agreed-upon educational program must be provided and funded," *de Paulino*, 959 F.3d at 536.[14]

Meanwhile, the DOE effectively mooted Plaintiffs' second and third concerns at oral argument. Counsel for the DOE explicitly represented that OPT was willing to offer transportation services equivalent to those established in each child's last unchallenged administrative order, *see* July 30, 2026 Tr. 23, and that it was willing to waive the requirement that iBrain provide a certificate of occupancy, *see id.* at 22. In light of those representations, the Court found that the DOE's offers to provide transportation services through OPT to the Undisputed iBrain Plaintiffs were made in good faith and — so long as they were translated into "concrete, student-specific OPT transportation arrangements" within two weeks, *see* ECF No. 56 — that they satisfy the DOE's obligations under the stay-put provision to provide "the same general level and type of services that the disabled child was receiving." *T.M.*, 752 F.3d at 171. If Plaintiffs are dissatisfied with the DOE's offer, they are free to "unilaterally change their child's placement during the pendency of review proceedings" and arrange for transportation

[14] Alternatively, the Court concludes, for similar reasons, that ordering the DOE to fund the Undisputed iBrain Plaintiffs' transportation services through Sisters Travel would not be "appropriate" relief, 20 U.S.C. § 1415(i)(2)(C)(iii), and exercises its discretion not to do so.

through Sisters Travel. *de Paulino*, 959 F.3d at 526 (cleaned up). But once again, "[t]hey do so . . . at their own financial risk." *Id.*

**2. Expedited Payments**

Next, the Court concludes that the Undisputed iBrain Parents are not entitled to an order mandating that the DOE make payments for tuition and nursing services on an expedited basis, let alone by August 5, 2026 (or any date certain). As noted, in *Mendez*, the Second Circuit held that "the IDEA's stay-put provision does not create an entitlement to immediate payment or reimbursement" or otherwise require the DOE to "circumvent its ordinary payment procedures." 65 F.4th at 63. At the same time, the Court held open the possibility that parents "may still be able to obtain such relief if they establish that a delay or failure to pay has jeopardized their child's educational placement." *Id.* Seizing on that language, Plaintiffs argue that they are entitled to immediate funding from the DOE because the new contracts that they signed with iBrain require either that they make payments by July 1, 2026, or obtain a court order by that date requiring the DOE to make payments within thirty-five days (i.e., by August 5, 2026). *See* Pls.' Suppl. PI Mem. 7. To accept that argument, however, would permit parents to collude with a private school to obtain relief to which they are otherwise not entitled under the IDEA. Indeed, the record makes clear that that is precisely what Plaintiffs sought to do here.

The Court reaches that conclusion whether Plaintiffs' request is properly construed as a request for relief pursuant to the stay-put provision or as a request for relief beyond what the stay-put provision requires. In either case, as discussed above, Plaintiffs must establish irreparable harm by showing that a delay in payment will "jeopardize[] their child's educational placement." *Mendez*, 65 F.4th at 63-64. And in either case — as Plaintiffs conceded at oral argument, *see* July 30, 2026 Tr. 39, 43-44 — the Court retains equitable discretion to grant only relief that is "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii); *see Honig*, 484 U.S. at 328; *Mackey*,

386 F.3d at 165. Whether or not Plaintiffs are *required* to satisfy the traditional preliminary injunction factors, consideration of those factors can inform the Court's exercise of that discretion, and here all four of the factors cut against granting the extraordinary relief that Plaintiffs seek.

**a. Irreparable Harm**

The Court begins with irreparable harm because Plaintiffs must demonstrate it whether or not the traditional preliminary injunction factors apply and, if the factors do apply, it is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). More specifically, Plaintiffs must show that they are "likely," *Salinger*, 607 F.3d at 79, to "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm," *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025). On the record before it as of July 31, 2026, the Court concludes that Plaintiffs failed to make that showing for two reasons.

First, the Court finds, as a matter of fact, that Plaintiffs' children's placements at iBrain are not likely to be jeopardized if the DOE provides funding in the ordinary course. In arguing otherwise, Plaintiffs rely solely on the new language in their contracts with iBrain and B&H Health Care, which purports to require that Plaintiffs either pay half of the (exorbitant) amounts due by July 1, 2026, or obtain a court order by that date requiring such payments within thirty-five days (i.e., by August 5, 2026). *See* Donohue Contracts 3. In fact, after being explicitly directed by the Court to identify what, if anything, in the record supported the claim that these students' placements were in jeopardy absent a court order, *see* July 30, 2026 Tr. 70-71, Plaintiffs' counsel cited only "the language of the 2026–27 iBRAIN enrollment contract itself, which Defendants' counsel read into the record and incorporated into his questions." ECF No.

53. But, as Plaintiffs' counsel conceded, that language can and must be considered in the context of the parties' historical course of dealing and the Plaintiffs' own understanding of the contracts. *See* July 30, 2026 Tr. 38 (counsel for Plaintiffs acknowledging that the Court can look outside the terms of the contract to determine whether these Plaintiffs will suffer irreparable harm). That larger context supports an inference that iBrain will not exclude Plaintiffs' children from school if, as the Court has, the DOE is ordered to fund their placements in the ordinary course.

Indeed, iBrain has never collected more than token amounts from Plaintiffs for their children's attendance at iBrain. *See* Interrogatory Responses 6-8. Some Plaintiffs have occasionally paid a $100 deposit to iBrain; many have not even paid that small amount. *Id.* Instead, iBrain and LFLG have been content to assume responsibility for collecting funds from the DOE and have apparently accepted whatever they could get from the DOE as satisfying each parent's obligations. Consistent with that historical course of dealing, the evidence indicates that — notwithstanding the new language in this year's contracts — not a single parent had made any payment to iBrain or B&H Health Care for the 2026-27 school year as of June 30, 2026, the date the Court granted the TRO. *See* ECF No. 40-4 ("Donohue July 17 Tr."), at 62-63. Moreover, Plaintiffs' depositions confirm that they do not understand their obligations under the contract to be truly binding on them. For example, when Plaintiff Kemraj Moonsammy was asked if he had "spoken to anyone at iBrain about concerns that [he] might be unable to pay th[e] contract amount," he responded that he was "not worried because Patrick [Donohue] is not going to have us pay anything on what was written." ECF No. 48-4, at 37. Similarly, Plaintiff Kabba confirmed that it was her belief that she "[was] not required to pay anything to iBrain based on the fact that [she] ha[d] never been asked to pay anything to iBrain." ECF No. 40-5, at 27-28. Plaintiff Mildred De Los Santos was even more explicit: "I've never known that I had to pay." ECF No. 48-6, at 19. Finally, Donohue refused to answer whether there is anyone at iBrain

"tasked with reaching out to parents who have not made payments or received orders," further strengthening the inference that payments by the parents are not truly contemplated. Donohue July 17 Tr. 66-67. In short, the record indicates that Plaintiffs' children are likely to be able to continue attending iBrain (and using the services of B&H Health Care) as long as they are entitled to receive funding in the ordinary course from the DOE, as the Court has ordered.

Second, even if the Court were to take the new contractual language at face value, it would not suffice to establish irreparable harm because any harm Plaintiffs suffer as a result of the contracts would be entirely self-inflicted. It is well established "that a plaintiff cannot meet the irreparable harm requirement by 'manufactur[ing] [his] own exigency.'" *Kilinc v. PMMUE Eduservices Private Ltd.*, No. 25-CV-7931 (AT) (GWG), 2026 WL 601937, at *8 (S.D.N.Y. Mar. 4, 2026) (quoting *Convergen Energy WI, LLC v. L'Anse Warden Electric Co., LLC*, No. 20-CV-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020)); *see Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable."); *see also* 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed. 1998) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."). That is precisely what Plaintiffs have attempted to do here — first, by voluntarily entering into agreements with iBrain and B&H Health Care requiring payment (or a court order) by a date certain and, second, by opting to put all their eggs in the court-order basket. To allow Plaintiffs (and their counterparties) to create their own irreparable harm in this manner would give rise to the intolerable result of "[t]he parties to a contract . . . secur[ing] by agreement among themselves the equitable power of the court." *Convergen Energy*, 2020 WL 5894079, at *6 (citing *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987)); *see also E.M.*, 758 F.3d at 461 (observing that whether a parent's "arrangement with the school

[is] fraudulent or collusive . . . bear[s] . . . on the equities" of the parent's claim for relief under the IDEA).

In fact, there is an especially powerful reason not to permit Plaintiffs (and their counterparties) to contrive their own irreparable harm in these cases: Because the costs would fall on an entity that did not negotiate or sign the contracts, namely the DOE. Notably, the Second Circuit has explicitly likened this type of arrangement to one between an insurer and insured to seek recovery from a third-party tortfeasor. *See E.M.*, 758 F.3d at 460-61. Recognizing the risks of collusion in such arrangements, courts apply heightened scrutiny to such contracts and sometimes hold them void for reasons of public policy because of that risk. *See, e.g.*, *Continental Cas. Co. v. Hempel*, 4 F. App'x 703, 717 (10th Cir. 2001) (noting that such agreements have "the high potential for fraud or collusion because with no personal exposure the insured has no incentive to contest liability or damages and the insured's best interests are served by agreeing to damages in any amount . . . ." (cleaned up)); *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 712-13 (Tex. 1996) (holding such an agreement void against public policy because it led "the parties [to take] positions that appeared contrary to their natural interests for no other reason than to obtain a judgment against [the insurer]"). For similar reasons, courts have also held that contracts are unenforceable as a matter of public policy when their performance is intended to effect a fraud on a third party. *See, e.g.*, *Deligiannis v. Pepsico. Inc.*, 757 F. Supp. 241, 253 (S.D.N.Y. 1991) ("The alleged agreement is patently unenforceable because its performance would have worked a fraud on Buchanan."). As these cases recognize, to require a third party to bear the costs of harms that plaintiffs (and their counterparties) create through their own voluntary decisions would create an intolerable risk of collusion, if not fraud.

As a matter of fact, there is good reason to believe that that sort of collusion is precisely what LFLG, iBrain, B&H Health Care, and Plaintiffs engaged in here.[15] Donohue, for example, candidly admitted that he drafted the new contractual language precisely to ensure that parents and iBrain could get what the Second Circuit had denied them in *Mendez*: an order forcing the DOE to "lock in," Donohue July 15 Tr. 64, the pendency rights of the child and creating a "more definitive timeframe of implementation." Donohue July 17 Tr. 29. Put differently, Donohue drafted the new language to jeopardize the students' placements at iBrain (or, more precisely, to create the appearance of such jeopardy) so that he could force a third party, the DOE, to "circumvent its ordinary payment procedures" and accelerate payments. *Mendez*, 65 F.4th at 63. The Court will not sanction such collusion by granting equitable relief to Plaintiffs.

In short, Plaintiffs' children do not face an "actual and imminent" risk of losing their placements at iBrain absent an order mandating expedited payments from the DOE. *Nat'l Ass'n for Gun Rights*, 153 F.4th at 248. First, the risk of such harm is speculative insofar as iBrain has historically permitted parents to flout the terms of the enrollment agreements they sign so long as the DOE ultimately makes pendency payments. And second, to the extent that Plaintiffs' children lose their placements at iBrain or access to nursing services, those harms are entirely self-inflicted and cannot, as a matter of law, constitute irreparable harm.[16]

---

[15] To be clear, there is no evidence that Plaintiffs (other than Donohue himself) personally colluded in this manner — if only because there is no evidence that any of them (other than Donohue himself) played a role in drafting the terms of the contracts at issue; indeed, most were not even aware of those terms. But it is fair to describe them as parties to a collusive arrangement insofar as Donohue and LFLG are acting as their agents.

[16] Shortly after the Court issued its July 31, 2026 bottom-line Order, LFLG filed an email from iBrain's Chief Operating Officer indicating that the school would be closed as of August 3, 2026, due to the Court's Order. *See* ECF No. 55-1. In the Court's view, that is little more than iBrain doubling down on its litigation strategy — at the expense of the children with disabilities that the school purports to serve. If so, shame on iBrain. But regardless, any such development could not and does not affect the Court's analysis because (1) in issuing the Order, the Court

**b. The Other Preliminary Injunction Factors**

Plaintiffs' failure to establish irreparable harm is fatal to their request for an order mandating accelerated payments from the DOE, whether the traditional preliminary injunction factors apply or not. For that reason, the Court need not dwell as long on the other preliminary injunction factors, namely the likelihood of success on the merits, the balance of the equities, and the public interest. Nevertheless, the Court touches on them briefly because they too cut against Plaintiffs — and thus make plain why the relief they seek would not be an "appropriate" exercise of the Court's equitable discretion to grant relief under the IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii).

As to the likelihood of success on the merits, Plaintiffs do not dispute that, under *Mendez*, they lack any entitlement to an order that requires the DOE "to circumvent its ordinary payment procedures," by making payments by a date certain absent a showing that "a delay or failure to pay has jeopardized child's educational placement." *Mendez*, 65 F.4th at 63.[17] Instead, they assert that they have made that showing based on the relevant provisions of the contracts. *See* Pl. Suppl. PI Mem. 7-8. But as discussed above, Plaintiffs have failed to carry their burden of showing irreparable harm. It therefore follows that they have *also* not shown a likelihood of success on the merits of their claim that they are entitled to expedited payments by August 5,

---

could consider only the record before it at that time; (2) in light of Plaintiffs' appeal from the Order, the Court lacks jurisdiction to reconsider or modify its Order; and (3) for the reasons explained above, any harm to the children caused by iBrain's closure is entirely self-inflicted.

[17] It is worth noting that the DOE's "ordinary payment procedures" are proceeding apace for at least two of the Undisputed iBrain Plaintiffs. *See* ECF No. 44 ("Pls.' Reply"), at 16-18. Each has received a pendency order from an IHO ordering the DOE to pay tuition costs to iBrain, and the DOE has begun the process of collecting documentation to make payments. *See* ECF No. 45-1, at 4; ECF No. 45-4, at 2. But contrary to the DOE's view, *see* ECF No. 47, at 5, the issuance of those pendency orders does not moot these two Plaintiffs' claims because the orders did not direct the DOE to make payments by August 5, 2026, and therefore did not provide all of the relief that Plaintiffs seek here.

2026. Instead, they are entitled only to payments by the DOE in the ordinary course and "in accordance with [DOE's] ordinary payment procedures." ECF No. 54, at 2; *see also Otero*, 2025 WL 2078950, at *7 (directing the DOE to "promptly process [the student's] payments, *pursuant to its ordinary payment procedures* . . . ." (emphasis added)).[18]

For similar reasons, the balance of the equities and the public interest do not favor Plaintiffs — and, indeed, would, by themselves, justify denial of the extraordinary relief they are seeking. *See, e.g.*, *Winter*, 555 U.S. at 23-24. On one side of the ledger, there is, as discussed above, scant reason to believe that Plaintiffs' children are actually at risk of losing their placements at iBrain if the DOE pays their costs in the ordinary course; moreover, to the extent there are any risks, Plaintiffs brought those risks upon themselves through their own voluntary, if not collusive, choices. Meanwhile, an order requiring the DOE to pay vast sums on an accelerated basis would leave the DOE "unable to implement basic budgetary oversight measures" and potentially risk millions of dollars of taxpayer money because, as noted, payments made pursuant to the stay-put provision cannot be recouped — even if the school

---

[18] Because the Court orders payments to be made pursuant to DOE's "ordinary payment procedures," and those procedures appear to require the submission of receipts for verification, the Court need not and does not address the DOE's argument that the Court should condition any award of payment on proof that services were actually provided. *See* DOE Reply 6-7; *see also Mendez*, 65 F.4th at 63 (observing that the stay-put provision does not "entitle[] parents . . . to immediate payment" in part because it would prevent school districts from "implement[ing] basic budgetary oversight measures, *such as requiring receipts before reimbursement*" (emphasis added)). At the same time, the Court's use of the phrase "ordinary payment procedures" does not provide the DOE with *carte blanche* to violate its obligations to implement pendency under the IDEA. More specifically, because "an educational agency's obligation to maintain stay-put placement is triggered when an administrative due process proceeding is initiated," *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015), — i.e., when a DPC is filed — the DOE cannot condition pendency implementation on the issuance of an interim pendency order by an IHO or withhold funding until its appeal of such an order is resolved. Likewise, the DOE may not withhold all funding or refuse to fully implement pendency solely because it disputes one component of the student's placement. *See, e.g.*, *Crespo v. Aviles-Ramos*, No. 25-CV-7563 (JAV), 2025 WL 3022389, at *5-7 (S.D.N.Y. Oct. 29, 2025).

district later prevails on the merits. *Mendez*, 65 F.4th at 63 (cleaned up). "[N]othing in the statutory text or the legislative history of the IDEA . . . implies a legislative intent to permit parents or guardians to utilize the stay-put provision's automatic injunctive procedure to frustrate the fiscal policies of participating states" in that way. *Id.* More to the point, nothing in the statutory text or the legislative history of the IDEA suggests that Congress intended to permit parents and private schools to collude at the expense of school districts in that way.

Ultimately, to see why the balance of equities and the public interest weigh against Plaintiffs — and why the relief they are seeking, an order requiring accelerated payments based solely on the contracts to which they agreed, would not be "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii) — one need only consider a hypothetical contract requiring a court order mandating payment by the DOE to a school of $1 billion dollars by July 1, 2026, for a single child. When confronted with this hypothetical at oral argument, counsel for Plaintiffs demurred only that $1 billion would be an "objectively unreasonable" amount. July 30, 2026 Tr. 43. But he did not provide any logical or legal basis for a court to determine what would be an "unreasonable" amount. More tellingly, he did not address the timeframe aspect of the hypothetical at all. In doing so, he all but conceded that if the Court were to embrace Plaintiffs' theory, it would essentially allow private schools such as iBrain to arrogate to themselves the ability to set deadlines by which the DOE must make pendency payments by contract. Permitting that outcome would not be in the public interest; it would offend the public interest.

* * * *

For all of these reasons, the Court denies the Undisputed iBrain Plaintiffs' motions for preliminary injunctions to the extent they seek orders directing the DOE to make payments on an expedited basis or by a date certain, such as August 5, 2026.

**3. Cost Increases**

For many of the same reasons — including the lack of irreparable harm and the risks of collusion — the Court exercises its equitable discretion to order the DOE to fund the Undisputed iBrain Plaintiffs' placements at iBrain and nursing services through B&H Health Care at 2025-26 rates. In other words, the Court declines to order the DOE to pay the *increases* in those rates merely because the contracts that Plaintiffs entered into call for them. That gives authority in the first instance to determine whether the increased costs are justified — and, relatedly, whether the increased costs are associated with services that were not part of a student's last agreed-upon placement — to IHOs, who have "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007) (internal quotation marks omitted). Moreover, it is consistent with IHOs' discretion to deny "[t]otal reimbursement . . . if [they] determine[] that the cost of private education was unreasonable." *Florence Cnty. Sch. Dist. Four v. Carer ex rel. Carter*, 510 U.S. 7, 16 (1993); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009) (stating that, even if a plaintiff establishes a right to reimbursement under the IDEA, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant"); *E.M.*, 758 F.3d at 461 (observing that a district court may consider "whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the [school district]" in making its "equitable determination" of whether relief under the IDEA is appropriate).

Notably, Plaintiffs themselves all but invite that result when they argue that "a bona fide cost dispute would license, at most, litigation over the increment — never the withholding of every dollar. Defendants funded these same placements at last year's rates; that undisputed floor must flow now, whatever becomes of the increment." Pls.' Suppl. PI Mem. 9. The Court agrees and, thus, orders the DOE to provide pendency funding to iBrain and B&H Health Care (albeit in

the ordinary course) at "last year's rates"; Plaintiffs may seek "the increment[s]" through the state administrative process in the first instance.

**E. Loose Ends**

A couple of housekeeping matters remain. As noted above, in a joint letter filed on August 10, 2026, ECF No. 63, Plaintiffs requested that the Court "(1) permit the parties to submit a further joint letter by August 17, 2026, or within one week of the Court's forthcoming Opinion, proposing a coordinated briefing schedule for the remaining claims, . . . ; and (2) direct DOE to file, by August 21, 2026, a status report addressing its compliance with the Court's existing Orders as set forth above." Both requests are DENIED. As to the former, the Court concludes — as an exercise of its broad discretion with respect to case management — that the better course is to stay these cases pending resolution of Plaintiffs' interlocutory appeals since the outcome of those appeals will bear significantly on, if not moot, Plaintiffs' claims. As to the latter, Plaintiffs provide no basis to require ongoing, open-ended reporting by the DOE regarding its compliance with the Court's Orders. It is enough to say here that the Court presumes the DOE's compliance with its obligations under those Orders and that the Court retains jurisdiction to enforce its Orders and to resolve any disputes as they arise. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994) ("[W]hile an appeal of an order or judgment is pending, the court retains jurisdiction to implement or enforce the order or judgment.").

## CONCLUSION

At bottom, the crux of Plaintiffs' theory is that by signing a contract, a parent and private school can compel a federal court to issue an order directing a school district to circumvent its ordinary payment procedures and make pendency payments to their preferred providers on their preferred timelines and in their preferred amounts — never to be recouped, even if the school district ultimately prevails on the merits. Neither logic nor the law requires that result.

Accordingly, and for the reasons stated above, Plaintiffs' motions for a preliminary injunction are GRANTED in part and DENIED in part as set forth in the Court's July 31, 2026 Order, ECF No. 54, as modified in its Order issued later that same day, ECF No. 56.

Taking a step back, the tactics of iBrain and LFLG in these cases and others should give one pause. For years, they have sought to exploit several structural quirks of the IDEA's stay-put provision (and judicial interpretation thereof): that it creates an entitlement to an "automatic injunction"; that it does not require administrative exhaustion; and that payments made by a school district pursuant to it are not recoupable. These efforts make plain that the goal is for iBrain and LFLG to get as much taxpayer money from the DOE as they can, as quickly as they can, safe in the knowledge that they will not have to give the money back even if the DOE ultimately prevails. Thus far, courts have largely rejected their efforts. But the costs incurred — by the court system, if not by taxpayers — have been substantial. And if this Court's decision here does not survive appellate review, it will provide a roadmap for unsavory schools and parents to exploit the public fisc. Moreover, if past is prologue, iBrain and LFLG are likely to keep at their efforts, employing ever more creative means (like the new contract language at issue here) to get their hands on taxpayer funds. In the Court's view, these concerns warrant attention from policymakers, who would be better able than the judicial branch to balance the competing equities and reduce the incentives to engage in the sort of gamesmanship that iBrain and LFLG have engaged in to date. Accordingly, the Court takes the unusual (but not unprecedented) step, *see United States v. Gatlin*, 216 F.3d 207, 209, 223 (2d Cir. 2000), of directing the Clerk of Court to forward a copy of this Opinion and Order to relevant policymakers — namely, to the Chair and Ranking Member of the U.S. Senate Committee on Health, Education, Labor and Pensions; the Chair and Ranking Member of the House Committee on Education and the Workforce; and the Speaker of the New York City Council.

The Clerk of Court is directed to (1) docket this Opinion and Order in all cases listed in the Appendix to ECF No. 54; (2) forward a copy of this Opinion and Order to (a) the Chair and Ranking Member of the U.S. Senate Committee on Health, Education, Labor and Pensions; (b) the Chair and Ranking Member of the House Committee on Education and the Workforce; and (c) the Speaker of the New York City Council; and (3) terminate ECF No. 38.

SO ORDERED.

Dated: August 21, 2026
New York, New York

JESSE M. FURMAN
United States District Judge